TJOFLAT, Circuit Judge:
Tempur-Pedic North America, Inc. (“TPX”) manufactures visco-elastic Tempur-Pedic foam mattresses and sells them to consumers nationwide through distributors and its own website. These sales amount to eighty to ninety percent of the visco-elastic foam mattresses sold in the United States.[1] TPX sets the minimum retail prices the distributors can charge for its mattresses; TPX adheres to those minimum prices in the sales it makes through its website.
Benny and Wanda Jacobs (“Jacobs”)[2] purchased a Tempur-Pedic mattress from a TPX distributor in Rome, Georgia, at a price equal to or above the minimum price stated in the distributor’s agreement with TPX. After purchasing the mattress, Jacobs brought this antitrust action in the Northern District of Georgia, Rome Division, against TPX under the Sherman Act, *1332 15 U.S.C. § l.[3] He claims that TPX created an “unreasonable restraint of trade” in violation of the Act in two ways: by enforcing the vertical retail price maintenance agreements with its distributors and by engaging with its distributors in horizontal price fixing. Jacobs seeks treble damages against TPX on behalf of all who have purchased Tempur-Pedic mattresses in the United States and an injunction against TPX’s further implementation of the retail price maintenance agreements.[4] - The district court, on TPX’s motion, dismissed Jacobs’s complaint for failure to state a claim for relief[5] and entered a final judgment for TPX. The court then denied Jacobs’s motions to alter or amend the judgment[6] or, alternatively, for -leave to amend the complaint.[7] Jacobs now appeals all three rulings. We affirm.
We review the district court’s rulings in two parts. We first determine whether Jacobs’s antitrust allegations were sufficient to withstand TPX’s motion to dismiss. We then consider whether the district court should have granted either of Jacobs’s alternative post-judgment motions.
I.
We begin our assessment of the sufficiency of Jacobs’s antitrust claims by setting out the standard for reviewing a motion to dismiss an antitrust claim. The review is de novo. Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc’ns, Inc., 376 F.3d 1065, 1070 (11th Cir.2004). As the Supreme Court instructed in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), in a case brought under § 1 of the Sherman Act, we must determine whether the complaint, in asserting a conspiracy or agreement in restraint of trade, contains “allegations plausibly suggesting (not merely consistent with) [a conspiracy or] agreement,” that is, whether the complaint “possesses] enough heft to show that the *1333 pleader is entitled to relief.” Id. at 557, 127 S.Ct. at 1966 (quotations and alteration omitted). Plausibility is the key, as the “well-pled allegations must nudge the claim ‘across the line from conceivable to plausible.’ ” Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir.2009) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. at 1974). And to nudge the claim across the line, the complaint must contain “more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.” Twombly, 550 U.S. at 555, 127 S.Ct. at 1965. “[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.” Ashcroft v. Iqbal, 556 U.S. —-, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing Twombly, 550 U.S. at 555, 127 S.Ct. at 1964-65).
In conducting de novo review, we engage in the same exercise a district court does in assessing the sufficiency of an antitrust complaint. It is a two-step process:
[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.
Id. at 1950.
In this case, therefore, after determining whether the complaint’s averments are more than bare legal conclusions, we examine the complaint for a sufficient quantum of allegations to plausibly suggest that TPX agreed with its distributors to restrain trade in violation of the Sherman Act. We do this mindful that this is a “context-specific task that requires the reviewing court to draw on its judicial experience and common sense.” Id.
II.
Jacobs contends that the district court erred in two ways in dismissing the complaint. First, he argues that the complaint sufficiently alleged vertical resale price maintenance agreements between TPX and its distributors that were illegal under the rule of reason. Second, he argues that the complaint provided facts sufficient to establish horizontal price fixing by TPX and its distributors under the per se rule. We address these arguments in order.
A.
Section 1 of the Sherman Act makes unlawful “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.” 15 U.S.C. § 1. Although the section’s language seems automatically to prohibit any kind of concerted restraint of trade, the Supreme Court’s interpretation of the Act indicates that many forms of concerted action are to be evaluated under a flexible, case-by-case standard: the so-called “rule of reason.” See Standard Oil Co. v. United States, 221 U.S. 1, 58-62, 31 S.Ct. 502, 515-16, 55 L.Ed. 619 (1911) (adopting the rule of reason). Under the rule of reason, “the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.” Cont’l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. *1334 2549, 2557, 53 L.Ed.2d 568 (1977).[8]
 By contrast, per se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition. Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S.Ct. 1276, 1279, 164 L.Ed.2d 1 (2006); Sylvania, 433 U.S. at 50, 97 S.Ct. at 2557. Examples of such per se illegality include horizontal price fixing among competitors, group boycotts, and horizontal market division — business relationships that, in the courts’ experience, virtually always stifle competition. See, e.g., United States v. Topeo Assocs., Inc., 405 U.S. 596, 607-08, 92 S.Ct. 1126, 1133-34, 31 L.Ed.2d 515 (1972).
For many years, vertical resale price maintenance agreements, like the one alleged in Jacobs’s complaint, were per se unlawful. Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373, 405, 31 S.Ct. 376, 383, 55 L.Ed. 502 (1911) (“Nor can the manufacturer by rule and notice, in the absence of contract or statutory right, even though the restriction be known to purchasers, fix prices for future sales.”), overruled by Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 907, 127 S.Ct. 2705, 2725, 168 L.Ed.2d 623 (2007). Even though Dr. Miles’s reasoning rested on infirm economic rationales,[9] the Supreme Court im *1335 plicitly upheld the per se illegality of vertical resale price maintenance agreements for nearly a century after Dr. Miles came down. See, e.g., Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); Sylvania, 438 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18 (“The per se illegality of [vertical] price restrictions has been established firmly for many years .... ”); cf. Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 735-36, 108 S.Ct. 1515, 1525, 99 L.Ed.2d 808 (1988) (“[E]conomic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal per se unless it includes some agreement on price or price levels.”).
But even as the Supreme Court nominally upheld the per se illegality of vertical resale price mínimums, it relaxed per se rules on other vertical restraints in favor of rule of reason analysis. The Court, for example, declared maximum resale price maintenance agreements subject to the rule of reason. State Oil Co. v. Khan, 522 U.S. 3, 18-22, 118 S.Ct. 275, 283-85, 139 L.Ed.2d 199 (1997), overruling Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). The Court also declared non-price vertical restraints inappropriate for per se condemnation, applying instead the rule of reason. Sylvania, 433 U.S. at 57-58, 97 S.Ct. at 2561-62, overruling United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). And the Court also made clear that it evaluates a manufacturer’s termination of its agreement with an undesired discounting distributor under rule of reason analysis. Bus. Elecs., 485 U.S. at 727, 108 S.Ct. at 1521. Thus, by the time the Court decided Leegin, the jurisprudential foundations supporting the analysis of vertical resale price minimums under the per se rule were already substantially weakened.
In Leegin, a manufacturer of leather goods refused to sell to retailers that discounted its goods below the manufacturer’s suggested prices. One retailer, to whom the manufacturer stopped selling after the retailer refused to cease discounting below the suggested prices, sued the manufacturer, alleging that it had entered into vertical minimum resale price agreements that were per se illegal under Dr. Miles. Leegin, 551 U.S. at 882-84, 127 S.Ct. at 2710-12. The Supreme Court disagreed, expressly overruling Dr. Miles because “the reasons upon which Dr. Miles relied do not justify a per se rule.” Id. at 887-89, 127 S.Ct. at 2713-14; see also supra note 9. The Court recognized that “[m]inimum resale price maintenance can stimulate interbrand competition — the competition among manufacturers selling different brands of the same type of product — by reducing intrabrand competition— the competition among retailers selling the same brand.” Id. at 890, 127 S.Ct. at 2715. It can do so because eliminating intrabrand competition frees retailers to invest in enhanced services that more effectively sell the manufacturer’s products relative to rival manufacturers’ products. Additionally, customers receive more opportunities to choose among cheaper, lower-quality brands and more expensive, higher-quality brands. Id.; see also Sylvania, 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19 (observing that interbrand competition “provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product”). Furthermore, “[a]bsent vertical price restraints, the retail services that enhance interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate.” Id. (citing Sylvania, 433 U.S. at 55, *1336 97 S.Ct. at 2549).[10] The interests in reducing free riding and enhancing interbrand competition, reasoned the Court, outweighed the stare decisis concern of overruling Dr. Miles's nearly century-old precedent. After Leegin, therefore, courts must evaluate vertical resale price maintenance agreements using the rule of reason.
Under rule of reason analysis, a plaintiff may show either actual or potential harm to competition. Levine v. Cent. Fla. Med. Affiliates, Inc., 72 F.3d 1538, 1551 (11th Cir.1996). We address the sufficiency of Jacobs’s allegations of harm to competition infra. Regardless of whether the plaintiff alleges actual or potential harm to competition, however, he must identify the relevant market in which the harm occurs. See Fed. Trade Comm’n v. Ind. Fed’n of Dentists, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2018-19, 90 L.Ed.2d 445 (1986) (reversing the court of appeals’ vacatur of a Federal Trade Commission order because, inter alia, the Commission identified a market “even in the absence of elaborate market analysis”); Levine, 72 F.3d at 1551 (“Rule of reason analysis requires the plaintiff to prove ... an anti-competitive effect of the defendant’s conduct on the relevant market .... ”).
Jacobs argues that the district court erred by holding that the complaint failed to adequately plead a relevant market and thus did not show actual harm to competition. After reviewing the district court’s order, we agree that the complaint’s relevant market allegations fall short of what Twombly requires.
Section One plaintiffs must define both (1) a geographic market and (2) a product market. See Rossi v. Standard Roofing, Inc., 156 F.3d 452, 464 (3d Cir.1998) (“In the usual rule of reason case, to establish a violation of § 1, plaintiffs must prove ... that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets.”) Although the “parameters of a given market are questions of fact,” Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1573 (11th Cir.1991), antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets. Since both the geographic and product market allegations are necessary for a plaintiff suing under § 1 of the Sherman Act to succeed, a court, in assessing the sufficiency of the complaint, may begin by analyzing either one. See Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 n. 4 (9th Cir.2008) (analyzing the product market where the defendant did not challenge the plaintiffs assertion of the United States as a geographic market). We start with Jacobs’s product market allegation; as our analysis makes clear, Jacobs has not sufficiently pled the relevant product market.[11]
*1337 Jacobs contends the district court improperly concluded that the visco-elastic foam mattresses sold by TPX are part of one larger market for mattresses generally. The district court reasoned that although “visco-elastic foam mattresses may be very different from innerspring mattresses ... they are still a product on which people sleep.” Jacobs agrees, but insists that this is of no moment. Rather, what is important is that visco-elastic foam mattresses are a distinct submarket within the larger mattress market and, as such, must be examined separately for purposes of the product market definition.
Defining the relevant product market involves identifying “producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant’s product or services.” Levine, 72 F.3d at 1552. “The ‘market is composed of products that have reasonable interchangeability.’ ” Id. (quoting United States v. E.I. du Pont de Nemours & Co. (Cellophane), 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956)). Most importantly, we should look “ ‘to the uses to which the product is put by consumers in general.’” Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1221 (11th Cir.2002) (quoting Queen City Pizza, Inc. v. Domino’s Pizza, Inc., 124 F.3d 430, 438 (3d Cir.1997)).
A relevant product market can exist as a distinct subset of a larger product market. U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 995 (11th Cir.1993). The Supreme Court has provided “practical indicia” that can determine the contours of the submarket, such as “industry or public recognition of the sub-market as a separate economic entity, the product’s peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.” Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962).[12] A court should pay particular attention to evidence of the cross-elasticity of demand[13] and reasonable substitutability *1338 of the products, because “[i]f consumers view the products as substitutes, the products are part of the same market.” Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1435 (9th Cir.1995).
The district court relied on Cellophane in its product market analysis, holding that because visco-elastic foam mattresses and traditional innerspring mattresses are both “produces] on which people sleep,” the two products are interchangeable parts of the larger mattress market, a market as to which Jacobs did not allege any anticompetitive effects. Jacobs correctly points out that, unlike this case, Cellophane was based on a voluminous record, detailed in several published appendices, from which the Court could draw data on market share and substitutability of goods. 351 U.S. at 405-12, 76 S.Ct. at 1012-16. Here, because the district court dismissed his complaint based on its legal insufficiency, Jacobs argues that he did not have the chance to add facts in discovery which would have established visco-elastic foam mattresses as a separate relevant product submarket.
We cannot accept this argument, however, because it would absolve Jacobs of the responsibility under Twombly to plead facts “plausibly suggesting” the relevant submarket’s composition. Jacobs’s skimpy allegations of the relevant sub-market do not meet this obligation. The complaint alleges, without elaboration, that “[v]isco-elastic foam mattresses comprise a relevant product market, or sub-market, separate and distinct from the market for mattresses generally, under the federal antitrust laws.” This conclusional statement merely begs the question of what, exactly, makes foam mattresses comprise this submarket. The complaint provides no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general. Consumer preferences for visco-elastic foam mattresses versus traditional innerspring mattresses, and the costs associated with their sale, may vary widely, may vary little, or may not vary at all. Jacobs’s complaint, however, gives no indication of which of these is the case. The allegations that viscoelastic foam mattresses are more expensive than traditional innerspring mattresses and that visco-elastic foam mattresses have “unique attributes” are similarly of little help. They do not indicate the degree to which consumers prefer visco-elastic foam mattresses to traditional mattresses because of these unique attributes and differences in price. Would, for example, a consumer whose innerspring mattress was due for replacement be more likely to purchase another innerspring mattress or substitute a visco-elastic foam model for it? Are visco-elastic foam mattresses put to different uses (as luxury goods, such as in fine hotels and within higher income brackets) than are traditional mattresses? These types of questions, which our precedent makes clear are crucial to understanding whether a separate market exists, go unanswered in the complaint.
Moreover, “the broader economic significance of a submarket must be supported by demonstrable empirical evidence.” U.S. Anchor, 7 F.3d at 998. While we acknowledge that Jacobs did not have the chance to undertake extensive discovery because this case was dismissed on a Rule 12(b)(6) motion, he nevertheless had the obligation under Twombly to indicate that he could provide evidence plausibly suggesting the definition of the alleged sub-market. Such an indication is conspicuously lacking here; in its place is the unsupported assertion that visco-elastic *1339 foam mattresses constitute a distinct sub-market of the larger mattress market.
For these reasons, the complaint’s allegations of the relevant product market are legally insufficient. The complaint’s insufficiency, however, is not limited to the relevant product market allegations. Assuming for argument’s sake that the complaint defined that market, it failed to adequately allege actual or potential harm to competition.
Actual harm is indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market, Spanish Broad. Sys., 376 F.3d at 1072, and the plaintiff claiming it should point “to the specific damage done to consumers” in the market, id. (citing Full Draw Prods. v. Easton Sports, Inc., 182 F.3d 745, 753-54 (10th Cir.1999)). The plaintiff has the burden of demonstrating damage to competition with “specific factual allegations.” Id. at 1073. Ac tual anticompetitive effects include, but are not limited to, reduction of output, increase in price, or deterioration in quality. United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir.1993). Higher prices alone are not the “epitome” of anticompetitive harm (as Jacobs claims). Rather, consumer welfare, understood in the sense of allocative efficiency, is the animating concern of the Sherman Act. See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 221, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993) (noting the antitrust laws’ “traditional concern for consumer welfare and price competition”); Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979) (quoting Robert H. Bork, The Antitrust Paradox 66 (1978)) (“Congress designed the Sherman Act as a ‘consumer welfare prescription.’ ”). By “anticompetitive,” the law means that a given practice both harms allocative efficiency and could “raise[ ] the prices of goods above competitive levels or diminish[] their quality,” Rebel Oil, 51 F.3d at 1433, in addition to other possible anticompetitive effects such as those above. In turn, the ability to raise prices above the competitive level corresponds to a firm’s market power. See Ind. Fed’n of Dentists, 476 U.S. at 460-61, 106 S.Ct. at 2019. Here, beyond the bald statement that consumers lost hundreds of millions of dollars, there is nothing establishing the competitive level above which TPX’s allegedly anticompetitive conduct artificially raised prices.
Because Jacobs did not provide allegations plausibly suggesting actual harm to competition, his only avenue of relief was to sufficiently allege potential harm. To do so, Jacobs had to “define the relevant market and establish that the defendants possessed power in that market.” Levine, 72 F.3d at 1551. After those threshold requirements, Jacobs then had to make “specific allegations linking market power to harm to competition in that market.” Spanish Broad. Sys., 376 F.3d at 1073; see also id. (quoting Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97 (2d Cir.1998) (“Market power, while necessary to show adverse effect indirectly, alone is insufficient.”)). Here, in addition to having failed to allege the relevant product market (as explained above), Jacobs has failed to establish the connection between TPX’s power in the visco-elastic foam mattress market and harm to competition in that market.
We have held that “[m]arket power is the ability to raise price significantly above the competitive level without losing all of one’s business,” Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560, 1570 (11th Cir.1983) (citing Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d 742, 745 (7th Cir.1982) (Posner, J.)), and that “[m]arket share is frequently used in *1340 litigation as a surrogate for market power,” id. Jacobs’s complaint does allege that “TPX has 80-90% of sales in the visco-elastic foam mattress market,” but beyond this fact, the complaint provides no “direct evidence of the injurious exercise of market power [such as] evidence of restricted output and supracompetitive prices,” Rebel Oil, 51 F.3d at 1434, beyond stating that these conditions exist. This is another fatal blow to Jacobs’s case, because a showing of market power is necessary, but not sufficient, to establish potential harm to competition. Spanish Broad. Sys., 376 F.3d at 1073. The complaint here is bereft of the critical allegations linking TPX’s market power to harm to competition.
The extent of the complaint’s allegation that TPX harmed competition is the statement that the alleged resale price fixing agreements “have unreasonably restrained, do unreasonably restrain, and will continue to unreasonably restrain trade and commerce in the visco-elastic mattress market ... by eliminating price competition.” This sparse allegation is precisely the type of bare legal conclusion that was insufficient in Twombly and Iqbal. It provides no basis on which a court could determine how harm to competition results from TPX’s agreements with its distributors (if such harm results at all). Nor does the complaint allege that inter-brand competition — that is, how competitors react to the allegedly higher prices of TPX’s mattresses — has been harmed by marketwide increased prices or reduced output. See Leegin, 551 U.S. at 890, 127 S.Ct. at 2715 (“The promotion of inter-brand competition is important because ‘the primary purpose of the antitrust laws is to protect [this type of] competition.’ ” (quoting Khan, 522 U.S. at 15, 118 S.Ct. at 282) (alteration in Leegin)).
Just as firms in a perfectly competitive market are price-takers with respect to commodity prices, an appeals court is a complaint-taker when reviewing the district court’s dismissal of a claim as legally insufficient. With no record to go on, the court is limited to what appears on the face of the complaint. Here, the complaint contains insufficient factual allegations to plead a plausible case that TPX’s retail price maintenance agreements with its distributors had anticompetitive effects on the mattress market. Thus, the district court was correct to dismiss Jacobs’s claim based on those agreements.
B.
Jacobs also argues that the district court improperly dismissed his claim for horizontal price fixing.[14] Specifically, he contends that the dual distribution system TPX employed — where TPX sold mattresses both through its authorized distributors and through its own website— constituted a horizontal price-fixing conspiracy. TPX responds that the dual distribution system it used does not constitute a per se illegal horizontal conspiracy, and in fact is lawful under rule of reason analysis. The district court dismissed the horizontal price fixing claim because (1) courts generally have viewed manufacturer-distributor chains as vertical, not horizontal, in nature,[15] and (2) Jacobs did not *1341 allege a freestanding horizontal agreement solely among TPX, qua distributor, and its distributors.
We examine whether Jacobs’s allegations of horizontal price fixing are plausible under Twombly. Jacobs’s allegations stated that “TPX has entered into agreements with its distributors that allow TPX to set the prices at which a distributor ... must sell Tempur-Pedic mattresses .... These agreements between TPX and its distributors result in there being virtually no price competition among retailers and dealers in the sales of Tempur-Pedic mattresses.” Further, TPX “sells its mattresses directly to consumers, and sells them at the same prices at which it has agreed with its distributors to charge.”
Reading these allegations as a whole, we can draw two possible inferences from the fact that TPX and its distributors charged the same minimum price. The first inference is that an arrangement existed whereby TPX, qua manufacturer, used the vertical minimum price agreements as a guise for horizontally setting uniform prices above the market equilibrium level when it acted as a distributor. In this scenario, a horizontal arrangement would exist between TPX, qua distributor, and its distributors by dint of the vertical price agreements. According to Jacobs, this horizontal arrangement would represent tacit collusion by TPX and its distributors to set prices on Tempur-Pedic mattresses.[16] If correct, such an inference would support Jacobs’s theory of unlawful price fixing by TPX and its distributors.
The second inference is that TPX and its distributors set prices independently of each other; that is, TPX and its distributors happened to set the same price because it made economic sense to do so. Here is why the distributors would not set prices at any level other than the TPX-imposed minimum. TPX’s direct-distribution website acts as an “enforcement mechanism” to prevent distributors from raising prices. If the distributors raised their prices above the minimum resale price set by TPX, and TPX, qua distributor, did not raise its price, consumers would start purchasing Tempur-Pedic mattresses nearly exclusively from TPX’s website, eventually causing the distributors to lose significant amounts of business or to exit the market entirely. Hence, it is in the distributors’ independent economic interest to maintain prices at TPX-set min *1342 imums.[17]
Moreover, TPX would not undercut the minimum prices it imposes on its distributors. TPX, qua distributor, would not set its price under the minimum resale price because doing so would drive the distributors out of business as consumers switched to purchasing Tempur-Pedic mattresses from the website. This would be undesirable for TPX for economic reasons as well. TPX maintains the distributorship arrangement because its distributors provide showrooms where consumers can test out Tempur-Pedic mattresses, have the mattresses’ unique attributes explained to them by knowledgeable salespeople, and make an informed comparison between Tempur-Pedic mattresses and traditional innerspring mattresses — even if they later choose to purchase from TPX’s website. Such first-hand information is critical to making a purchasing decision about an item on which consumers will spend one-third of their lives, and TPX would be reluctant to forfeit that information by putting distributors out of business. Accordingly, TPX keeps the prices for its web distributorship equal to the resale price minimums because it is economically advantageous for TPX as well.
We noted earlier that under the pleading standards of Twombly and Iqbal, plausibility is the key. Given this standard, Jacobs had the burden to present allegations showing why it is more plausible that TPX and its distributors — assuming they are rational actors acting in their economic self-interest — would enter into an illegal price-fixing agreement (with the attendant costs of defending against the resulting investigation) to reach the same result realized by purely rational profit-maximizing behavior. Put another way, the potential costs of fixing prices with its distributors would outweigh any benefits that TPX would realize by doing so, particularly where independent economic activity would yield the same benefits with none of the costs.
In fact, the pleading standard enunciated in Twombly built upon the Court’s rejection of an argument similar to the one Jacobs makes. The Twombly plaintiffs’ complaint against incumbent local exchange long-distance carriers did not survive a motion to dismiss because any actions those carriers took to resist incursion by upstart carriers was “fully explained” by their “own interests in defending [their] individual territory.” Twombly, 550 U.S. at 552, 127 S.Ct. at 1963 (quotations omitted) (approving the district court’s dismissal of the complaint because “allegations of parallel business conduct, taken alone, do not state a claim under § 1”). The plaintiffs’ complaint led to competing inferences of conscious parallelism and independent business judgment, and the Court held that more allegations were required at the motion to dismiss stage:
[W]e have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict; proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action; and at the summary judgment stage a § 1 plaintiffs offer of conspiracy evidence must tend to rule out the possi *1343 bility that the defendants were acting independently.
Id. at 554, 127 S.Ct. at 1964 (citations omitted); cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (“[I]f the factual context renders [the plaintiffs] claim implausible — if the claim is one that simply makes no economic sense — [the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.”).
Here, like the Twombly Court, we fail to find in the complaint “facts that are suggestive enough to render a § 1 conspiracy plausible,” 550 U.S. at 556, 127 S.Ct. at 1965, when the inference of conspiracy is juxtaposed with the inference of independent economic self-interest. See Matsushita, 475 U.S. at 596-97, 106 S.Ct. at 1361 (“[I]f [the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.”) Moreover, even if tacit collusion were, in fact, the more plausible inference, tacit collusion is “not in itself unlawful.” Brooke Group, 509 U.S. at 227, 113 S.Ct. at 2590. Jacobs would have had to provide further allegations that, in addition to tacitly colluding, TPX and its authorized distributors somehow signaled each other on how and when to maintain or adjust prices. See id. at 227-28, 113 S.Ct. at 2590. The complaint contains no such allegations. There is no indication, for example, of dates on which distributors moved prices together, or the amounts by which the prices moved, if in fact they did.
For the foregoing reasons, the district court correctly dismissed Jacobs’s claim for horizontal price fixing.
III.
The district court denied Jacobs’s alternative motions to alter or amend the judgment under Federal Rule of Civil Procedure 59(e)[18] and to amend his complaint pursuant to Federal Rule of Civil Procedure 15(a).[19] Jacobs argues that the rulings constituted an abuse of discretion:[20] the court should have reversed the judgment and required TPX to answer the complaint and, if not, it should have vacated the judgment and granted him leave to amend.
*1344 A.
Jacobs’s motion to alter or amend the judgment claimed that the court, in dismissing the complaint, erred in concluding that the complaint “failed to sufficiently allege an anticompetitive effect of defendant’s conduct.” According to Jacobs’s motion, the complaint satisfactorily alleged “actual harm to competition” and “a relevant product market” and that the court misapplied the Twombly standard in finding the allegations insufficient. Particularly egregious was the court’s product market determination; the disagreement between the parties as to the correct product market was a factual dispute that could not be resolved on a motion to dismiss.
In Arthur v. King, we observed that
“[t]he only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact.” In re Kellogg, 197 F.3d 1116, 1119 (11th Cir.1999). “[A] Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment.” Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 763 (11th Cir.2005).
500 F.3d 1335, 1343 (11th Cir.2007) (per curiam) (alterations in original).
Having read Jacobs’s motion, we conclude that it did nothing but ask the district court to reexamine an unfavorable ruling. Reconsidering the merits of a judgment, absent a manifest error of law or fact, is not the purpose of Rule 59. We find nothing in the district court’s order that would constitute a manifest error of law or fact. Jacobs’s remedy, if he thought the district court ruling was wrong, was to appeal, a step he has taken. Since we have concluded that the court did not err in dismissing Jacobs’s complaint, it necessarily follows that it did not abuse its discretion in denying Rule 59(e) relief.
B.
Jacobs based his alternative motion, which called for vacating the judgment and entering an order of dismissal with leave to amend the complaint, on the provisions of Federal Rule of Civil Procedure 15(a). He first seized upon Rule 15(a)(1), which states that “[a] party may amend its pleading once as a matter of course ... before being served with a responsive pleading.” Fed.R.Civ.P. 15(a)(1) (2007) (amended 2009). Noting that TPX had not filed a “responsive pleading, but only a motion to dismiss, [which is] not considered a responsive pleading for purposes of Rule 15(a)[(l)],” Jacobs’s motion stated that “a plaintiff may amend the complaint once as a matter of right.” Since he had not previously exercised that right, Jacobs contended, in effect, that an intervening judgment could not abolish the right. Jacobs further asserted that the district court abused its discretion by refusing to allow an amendment under Rule 15(a)(2), which directs the court to “freely give leave [to amend] when justice so requires.”
The problem with Jacobs’s arguments is that Rule 15(a), by its plain language, governs amendment of pleadings before judgment is entered; it has no application after judgment is entered. In United States ex rel. Atkins v. McInteer, we made this clear.
[Rule] 15(a) has no application once the district court has dismissed the complaint and entered final judgment for the defendant. Czeremcha v. Int’l Ass’n of Machinists and Aerospace Workers, AFL-CIO, 724 F.2d 1552, 1556 (11th Cir.1984). Wright, Miller & Kane, Federal Practice and Procedure, § 1489. Post-judgment, the plaintiff may seek *1345 leave to amend if he is granted relief under Rule 59(e) or Rule 60(b)(6). Id.; Czeremcha, 724 F.2d at 1556; Ahmed v. Dragovich, 297 F.3d 201, 207-09 (3d Cir.2002); Lindauer v. Rogers, 91 F.3d 1355, 1356 (9th Cir.1996); Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 597 n. 1 (5th Cir.1981).
470 F.3d 1350, 1361 n.22 (11th Cir.2006). Given this precedent, we could hardly hold that the district court abused its discretion in denying Jacobs leave to amend his complaint post-judgment.
IV.
For the foregoing reasons, the judgment of the district court is
AFFIRMED.

. The mattress industry in the United States produces and sells two types of mattresses: traditional innerspring mattresses and nontraditional mattresses, which includes viscoelastic foam mattresses such as those manufactured by TPX. The mattress industry has annual sales of $4 billion, $800 million of which consists of non-traditional mattresses.

. For simplicity, we refer to the Jacobses in the masculine singular throughout this opinion.

. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.” 15 U.S.C. § 1.

. Jacobs seeks the same relief against TPX’s parent corporation, Tempur-Pedic International, Inc. Although Jacobs’s complaint does not allege that the parent corporation and TPX are one and the same under an alter ego or other theory of liability, for purposes of this opinion we treat the two corporations as one entity: TPX.
The relevant treble damages provision reads:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney’s fee.
15 U.S.C. § 15. The relevant injunctive relief provision reads:
Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issuei.]
15 U.S.C. § 26.

. See Fed.R.Civ.P. 12(b)(6).

. See Fed.R.Civ.P. 59(e).

. See Fed.R.Civ.P. 15(a).

. The Court further described rule of reason analysis in this manner:
"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.”
Sylvania, 433 U.S. at 49 n. 15, 97 S.Ct. at 2557 n. 15 (quoting Chi. Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)).

. The most glaring flaw in Dr. Miles’s reasoning was its importation of restraints on alienation — a concept traditionally employed in the common law of property' — to justify prohibiting manufacturers from imposing price mínimums on downstream resellers. The Court's approach reflected "the formalism of the period” by applying “a common law standard with little obvious relevance to manufactured goods.” William H. Page, Legal Realism and the Shaping of Modern Antitrust, 44 Emory L.J. 1, 16 (1995); see also Ira S. Sacks & Hillel R. Silvera, A Return to Reason for Price Restraints, 24 Hofstra L.Rev. 1069, 1070 (1996) ("The factual assumptions and common law rule against restraints on alienation that underlied [sic] the Court’s condemnation of resale price maintenance, however, probably made no sense in 1911 and surely [are] inconsistent with modern antitrust jurisprudence which is based primarily on market impact and economic effect.”); Sylvania, 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21 (noting that most commentators regarded past Court reliance on the restraints-on-alienation rule in antitrust cases as “both a misreading of legal history and a perversion of antitrust analysis”).
More importantly, the Dr. Miles Court lacked the benefit of the modern consensus in economic literature that vertical resale price maintenance may have procompetitive effects in many circumstances. It did not consider, for example, that such agreements may stimulate interbrand competition by eliminating "free-riding” by discounting distributors and by reducing intrabrand competition based solely on services provided by retailers. Indeed, "[b]y the late 1970s, the Supreme Court itself recognized at least the possibility that such restraints may serve manufacturer interests in a procompetitive way.” 8 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1620c2, at 214 (2d ed.2004) [hereinafter Areeda]. As explained infra, the Court in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007), focused on several of these procompetitive justifications in shifting vertical resale price mínimums to rule of reason analysis.

. The Court fleshed out the free-rider concept by explaining that
[i]f the consumer can[, after learning about a product from an upscale retailer,] buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services to a level lower than consumers would otherwise prefer. Minimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider. With price competition decreased, the manufacturer’s retailers compete among themselves over services.
551 U.S. at 891, 127 S.Ct. at 2716.

. Jacobs’s geographic market allegation consists of a one-line statement that "[t]he relevant geographic market is the United States.” While this general allegation seems ambiguous without more information, see Brown *1337 Shoe Co. v. United States, 370 U.S. 294, 337, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962) ("[A]lthough the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area.”), we need not decide whether it is sufficient in this particular case. Jacobs cannot prevail because he has not adequately pled the relevant product market.

. Some have criticized Brown Shoe's language of "submarkets” and "practical indicia.” See, e.g., 4 Areeda ¶ 913a, at 62 ("One alternative that we do not recommend is a return to Brown Shoe’s language of ‘submarkets.’ ”); Fed. Trade Comm'n v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1058-59, 1061 (D.C.Cir.2008) (Kavanaugh, J., dissenting) (citing Robert H. Bork, The Antitrust Paradox 210, 216 (1978)) (casting doubt on the "practical indicia” language and calling the practical indicia test “moribund”), amending 533 F.3d 869 (D.C.Cir.2008). We do not enter this debate, as we find that even if Brown Shoe's practical indicia are worthy of dispositive weight as a general matter, Jacobs has not provided allegations sufficient to establish a relevant submarket for visco-elastic foam mattresses.

. The cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another. A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other — that is, consumers derive comparable utility from equivalent consumption of either one. For purposes of the relevant product market analysis, a high cross-elasticity of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market. See Cellophane, 351 U.S. at 400, 76 S.Ct. at 1010.

. Recall from the discussion supra that horizontal price fixing is one of the few per se illegal practices under the Sherman Act.

. This court has not adopted a per se rule for such classification; instead, we examine the circumstances of each dual distribution arrangement to see whether it more closely resembles a horizontal or vertical agreement. Some cases have classified dual distribution relationships as horizontal in character. See, e.g., United States v. McKesson & Robbins, 351 U.S. 305, 313, 76 S.Ct. 937, 942, 100 L.Ed. 1209 (1956); Hobart Bros. Co. v. Malcolm T. *1341 Gilliland, Inc., 471 F.2d 894, 899 (5th Cir.1973). The recent trend, however, while it does not illustrate a bright-line rule, has heen "to view the primary relationship between a dual distributor and an independent franchisee as vertical where the restrictions do not lessen interbrand competition or decrease the availability of goods or services.” Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 720 (11th Cir.1984) (per curiam); see, e.g., Graphic Prods., 717 F.2d at 1576; Abadir & Co. v. First Miss. Corp., 651 F.2d 422, 427-28 (5th Cir. Unit A 1981); Red Diamond Supply v. Liquid Carbonic Corp., 637 F.2d 1001, 1005-07 (5th Cir. Unit A 1981); H&B Equip. Co. v. Int’l Harvester Co., 577 F.2d 239, 245 (5th Cir.1978); Hesco Parts, LLC v. Ford Motor Co., No. 3:02CV-736-S, 2006 WL 2734429, at *4-5 (W.D.Ky. Sept. 22, 2006). Professor Areeda also notes that most recent cases have classified dual distributorships as vertical relationships subject to the rule of reason. 8 Areeda ¶ 1605b, at 70-71.

. The agreement would have to be tacit because the complaint makes no allegation of a direct agreement to fix prices. That is, the agreement would have taken the form of conscious parallelism. Yet even consciously parallel behavior by firms with similar economic interests in a concentrated market is not, by itself, unlawful; without more, parallel behavior could be "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.” Twombly, 550 U.S. at 553-54, 127 S.Ct. at 1964.

. Conversely, the same holds true for TPX: it would lose market share as a distributor by raising prices on its website above those charged by distributors, as long as customers’ transaction costs incurred in purchasing a Tempur-Pedic mattress from a distributor’s showroom were lower than the difference between the website price and the distributor’s price.

. The version of Rule 59(e) in effect when Jacobs filed his motions on December 21, 2007, provided: "A motion to alter or amend a judgment must be filed no later than 10 days after the entry of the judgment.” Fed. R.Civ.P. 59(e) (2007) (amended 2009).

. The version of Rule 15(a) in effect at the time of Jacobs's motion provided, in relevant part:
(a) Amendments Before Trial.
(1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course:
(A) before being served with a responsive pleading; or
(B) within 20 days after serving the pleading if a responsive pleading is not allowed and the action is not yet on the trial calendar.
(2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court’s leave. The court should freely give leave when justice so requires.
Fed.R.Civ.P. 15(a) (2007) (amended 2009).

. A district court’s "decision to alter or amend judgment is committed to the sound discretion of the district judge and will not be overturned on appeal absent an abuse of discretion.” Lawson v. Singletary, 85 F.3d 502, 507 (11th Cir.1996) (per curiam) (quoting Am. Home Assurance Co. v. Glenn Estess & Assocs., Inc., 763 F.2d 1237, 1238-39 (11th Cir.1985)). A district court's denial of a motion for leave to amend is reviewed under the same abuse of discretion standard. See Laurie v. Ala. Court of Criminal Appeals, 256 F.3d 1266, 1269 (11th Cir.2001).